John **MCDONOUGH**, Plaintiff,

v.

**CITY OF QUINCY**, Defendant.

No. CIV.A.01–11860 WGY.

United States District Court, D. Massachusetts.

Jan. 26, 2005.

Marisa A. Campagna, The Law Office of Marisa Campagna, Boston, MA, for John McDonough, Plaintiff.

Christine Marie Griffin, City Solicitor's Office, Quincy, MA, for Quincy, City of, Defendant.

David F. Grunebaum, Tobin, Sullivan, Fay & Grunebaum, Wellesley, MA, for Quincy, City of, Defendant.

Joseph A. MacRitchie, City Solicitor, City of Quincy, Quincy, MA, for Quincy, City of, Defendant.

Joseph A. Sarno, Jr., Gilman & Holtz, P.C., Boston, MA, for Quincy, City of, Defendant.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

## I. INTRODUCTION

This application for attorney's fees follows a trial between Plaintiff John McDonough ("McDonough") and the City of Quincy ("City"). Filed under Title VII, 42 U.S.C. § 2000e, *et seq.*, as amended ("Title VII"), and chapter 151B of Massachusetts General Laws, McDonough sought to recover damages for acts of retaliation allegedly taken against him by the City of Quincy. Pl.'s Compl. [Docket No. 1]. After a jury trial, a verdict was returned in favor of McDonough awarding $300,000 in damages. Jury Ver. [Docket No. 91]. Thereafter, McDonough filed a timely motion requesting attorney's fees and costs. Mot. for Atty's Fees and Costs [Docket No. 93]. In response, the City of Quincy filed a Motion for Judgment as a Matter of Law [Docket No. 98], which was denied. The issue before the Court concerns the amount to award McDonough in attorney's fees and costs in accordance with both Title VII and chapter 151B of Massachusetts General Laws.

McDonough originally requested attorney's fees in the amount of $144,706.25 and costs in the amount of $8,990.41, for a total of 153,696.66 absent any interest. Pl.'s Mem. of Law in Supp. of Mot. for Atty's Fees [Docket No. 94] ("Pl.'s Mem.") at 8[sic]. McDonough further requests prejudgment interest from the date of filing the Complaint, October 30, 2001, and post judgment interest on all amounts awarded from the date of judgment, April 21, 2004. *Id.* at 7[sic]. The City of Quincy filed a Motion in Opposition, stating, *inter alia,* that McDonough requested an incorrect rate for paralegal Brendan Ward—one that was not consistent with other documentation and supporting affidavits submitted by McDonough. Opp'n of the Def. City of Quincy to Pl.'s Mot. for Atty's Fees and Costs [Docket No. 102] ("Def.'s Opp'n") at 12. In response, McDonough admits that the rate requested for Brendan Ward is incorrect and asks that the

Court adjust the bill submitted accordingly. Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Atty's Fees and Costs [Docket No. 104] ("Pl.'s Reply") at 5.

## I. BACKGROUND

McDonough began work for the Quincy Police Department in December 1969. Def. City of Quincy's Mem. in Supp. of Its Mot. for Summ. J. [Docket No. 53] ("Def.'s Mem.") at 2. McDonough became a lieutenant in 1984 and in October 1990 he was assigned as Head of the Organized Crime Unit ("Drug Unit"). *Id.; see also* Pl.'s Statement of Disp. Mat. Facts in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. [Docket No. 63] ("Pl.'s Statement of Facts") at 1. In 1997, McDonough learned of a situation in which Sargent Charles Middendorf ("Middendorf") allegedly harassed Detective Nancy Coletta ("Coletta"). Pl.'s Statement of Facts at 1. On March 6, 1997, Coletta had a meeting with several City officials to discuss several allegations of harassment by officers in the Quincy Police Department. *Id.* at 2. The City did not take action against the officers Coletta reported. *Id.*

In April 1997, McDonough sent a letter to then-Mayor James Sheets ("Sheets") noting several problems he perceived in the Quincy Police Department. Def.'s Mem. at 3. On invitation to do so, McDonough later that month presented a report to Sheets that discussed several perceived problems within the Quincy Police Department, including reference to the alleged incident of harassment between Middendorf and Coletta. *Id.* at 3–4; *see also* Pl.'s Statement of Facts at 2.

Alleged incidents of harassment toward Coletta continued at the Department, including an incident in which Sargent Lukeman ("Lukeman") allegedly chased her through the station screaming at her. Pl.'s Statement of Facts at 3. In August 1999, Coletta met with Chief Thomas Frane ("Frane") and brought a list of multiple incidents of alleged harassment. *Id.* Upon hearing of Coletta's thoughts of filing suit, McDonough gave a copy of the page of his report referencing harassment against Coletta to Sargent Susan Perch ("Perch"), and further asked Perch to advise Coletta that he would testify on her behalf if need be. *Id.* In March 2000, Coletta filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination. *Id.*

On May 8, 2000, McDonough was transferred to the day shift by Chief Thomas Frane ("Frane"), resulting in a fifteen percent pay cut. *Id.* at 4. A number of other officers were also transferred within the Department at that time. Def.'s Mem. at 7. Following the transfer, Sargent Glynn told McDonough that he no longer had authority to sign overtime slips for the officers in the Drug Unit. Pl.'s Statement of Facts at 6. In March 2001, McDonough was told that he no longer had the authority to sign court slips for the members of the Drug Unit, which are essentially overtime slips for court appearances. *Id.*

Due to concerns regarding possible violation of his civil rights, McDonough called Acting Chief Terence Kelly ("Kelly") to discuss his changes in authority. *Id.* at 8. McDonough became aggravated and grew quite loud during the conversation. *Id.* Soon after, McDonough drafted a letter to personnel director Kevin Madden to discuss his concerns. *Id.* at 9–10. During a meeting with Madden, Falco, and McDonough, Madden placed a call to Dr. Donald Seckler ("Seckler"), a psychologist who had done previous work with the City. *Id.* at 10. At the meeting, it was decided that McDonough ought be put on administrative leave and his gun taken away pending evaluation. *Id.* Madden later asserted that Dr. Seckler advised Madden to take

these actions, although Dr. Seckler denied making any such recommendations. *Id.* at 10–11.

McDonough alleges that he had learned of ties between Captain Robert Crowley ("Crowley") and people involved in illegal activities that were being investigated by the Drug Unit. *Id.* at 13. McDonough felt that loss of his signing authority had been initiated by Crowley to prevent officers from attending the grand jury investigations against Crowley, and that these and other actions were a result of his assistance to Coletta. *Id.* at 16; *see also* Def.'s Mem. at 8. On October 31, 2001, McDonough filed a claim alleging retaliation under Title VII and under chapter 151B of Massachusetts General Laws. Pl.'s Compl. The City of Quincy moved for summary judgment, which motion was denied by Judge Tauro.[1] Following a jury trial, the jury entered a verdict for McDonough awarding $300,000 in damages. Jury Ver. McDonough here claims fees, costs, and interest.

## III. DISCUSSION

Under the "American Rule," prevailing parties are not ordinarily entitled to collect attorney's fees from the losing parties. *E.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (superceded by statute on other grounds). The Supreme Court has refused to alter this rule unless expressly authorized by Congress. *Id.* Prevailing parties are expressly authorized to seek attorney's fees for claims under both Title VII and Massachusetts General Laws chapter 151B. 42 U.S.C. § 2000e–5(k);[2] Mass. Gen. Laws. ch. 151B § 9.[3] As McDonough prevailed on claims under both Title VII and chapter 151B, he is entitled to seek reasonable attorney's fees and costs. The district court has broad discretion to determine the reasonable fees and costs that should be awarded. *Phetosomphone v. Allison Reed Group, Inc.,* 984 F.2d 4, 6 (1st Cir. 1993) (stating that in determining reasonable attorney's fees, "the trial court's range of discretion is particularly broad.").

In determining attorney's fees, the First Circuit applies the "lodestar method." *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984). Under the "lodestar" paradigm, the court must determine a lodestar figure by multiplying the number of hours productively expended by counsel by a reasonable hourly rate. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). This figure represents an initial estimate of reasonable fees which may be adjusted upward or downward based on factors particular to the case at hand. *Id.* at 434, 103 S.Ct. 1933. There is a "strong presumption," however, that the lodestar figure

---

**1.** The case was reassigned to this Court for all further proceedings on March 17, 2004. Order Reassigning Case [Docket No. 67].

**2.** 42 U.S.C. section 2000e–5(k) provides in relevant part:

> In any action or proceeding under this title the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

42 U.S.C. § 2000e–5(k).

**3.** Section 9 of chapter 151B of Massachusetts General Laws provides in relevant part:

> If the court finds for petitioner it shall, in addition to any other relief and irrespective of the amount in controversy, award the petitioner reasonable attorney's fees and costs unless special circumstances would render such an award unjust.

Ch. 151B § 9.

reflects a reasonable assessment of fees to be awarded. *System Mgmt., Inc. v. Loiselle*, 154 F.Supp.2d 195, 203–04 (D.Mass. 2001), *rev'd on other grounds*, 303 F.3d 100 (1st Cir.2002), (citing *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 555, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (discussing the fee-shifting provision of the Clean Air Act)). Finally, the court is to determine the reasonable and necessary expenses that ought be awarded. *Id.* (citations omitted).

## A. Attorney's Fees

### a. Hours Reasonably Expended

■ In calculating the lodestar estimate, only hours that were reasonably expended on the litigation ought be included. *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. Under the framework of *Hensley*, the court may reduce the number of hours asserted by the prevailing party if documentation is inadequate, or if effort put forth was "excessive, redundant, or otherwise unnecessary." *Id.* at 433–34, 103 S.Ct. 1933; *Grendel's Den, Inc.*, 749 F.2d at 950 (stating that "hours which were duplicative, unproductive, excessive, or otherwise unnecessary" should be subtracted from the number of hours actually invested). The First Circuit requires that the prevailing party must submit "detailed contemporaneous time records," the absence of which "will call for a substantial reduction of any award or, in egregious cases, disallowance." *Id.* at 952 (citations omitted); *Denny v. Westfield State Coll.*, 1989 WL 112823 at *3, 50 Fair Empl. Prac.Cas. (BNA) 699 (D.Mass.1989) (Freedman, C.J.).

■ McDonough has submitted records of hours spent by two attorneys and a legal assistant: lead counsel Attorney Marisa A. Campagna ("Campagna"), Attorney Mary Ellen Manning ("Manning"), and legal assistant Brendan Ward ("Ward").[4] The documents assert in sum that Campagna worked a total of 434.75 hours, Manning a total of 51.25 hours, and Ward a total of 27.5 hours. Aff. of Marisa A. Campagna in Supp. of Pl.'s Mot. for Atty's Fees [Docket No. 95] ("Campagna Aff.") at ¶¶ 8, 13, 14.[5] The City contends that the records submitted are not sufficiently detailed to justify the propriety or necessity of the hours expended. Def.'s Opp'n at 7–8.

■ After review of these records, the Court finds that the entries of billing hours are sufficient to satisfy the heightened standard of detail required under *Grendel's Den*. Most of the entries detail the exact nature of the task undertaken, and all properly account for the exact time expended and the date of the documented work. Entries documenting phone calls to the client or drafting of letters require no more explanation to meet the standard. *See Parker v. Town of Swansea*, 310 F.Supp.2d 376, 392 (D.Mass.2004) (Dein, M.J.) (stating that entries documenting phone calls with the plaintiff and his father "require no further details to be compensable"). Although it is not the duty of the court to dive into a large record in order to determine the reasonableness of fees requested where little or no detail is provided, nevertheless where there are minimal entries lacking detail and the detail absent is readily discoverable in the record, this

---

4. Hours of a legal assistant may be included in the lodestar calculation. *System Mgmt., Inc.*, 154 F.Supp.2d at 204 (citing *Missouri v. Jenkins ex rel. Agyei*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989)).

5. After a careful review of the records submitted detailing the hours expended, the Court finds that the total hours documented by Campagna is 410, not 434.75 as asserted in Pl.'s Mem. *See* Campagna Aff., Ex. A.

Court will not unnecessarily reduce the hours expended. *See id.* (holding that the records were sufficient where "the subject matter and nature of the tasks [were] either explicitly stated or readily ascertainable based on other information contained in the records.") Notably, the entries offering less detail are not "liberally peppered" throughout the billing records, nor are they indicative of "time [spent] on peripheral or irrelevant issues." *See Wilcox v. Stratton Lumber, Inc.*, 921 F.Supp. 837, 846 (D.Me.1996) (finding that several undetailed and unrealistic entries were indicative of excessive billing). Based on this review, the Court finds that the records kept and submitted were contemporaneous and offered adequate detail so that the Court could offer meaningful review of the reasonableness of the time expended.

■ In reviewing the records, it appears that Manning and Ward both bill for time expended taking notes during certain dates of the trial. As previously noted, duplicative work ought not be considered in the calculation of attorney's fees. *Hensley*, 461 U.S. at 433–34, 103 S.Ct. 1933; *Grendel's Den, Inc.*, 749 F.2d at 950. While Manning and Ward both bill for note-taking at trial on April 14, 2004 and April 16, 2004, it is clear from the billing entries that Ward was primarily responsible for taking notes every day of the trial, Campagna Aff., Ex. A, and Manning was responsible for taking notes at the trial when other responsibilities, such as developing strategy for division of responsibilities, did not conflict. *Id.* It is not unreasonable to expect that an attorney assisting in a trial would want to attend the first day of trial in order appropriately to assist lead counsel in shaping the remainder of the litigation, nor is it unreasonable to expect that the assisting counsel would be responsible for taking notes during trial in order to have the capacity to determine the appropriate division of responsibilities amongst counsel in preparing the remaining trial-related tasks. While the Court therefore will not second guess the choice to have both Manning and Ward attend the trial and take notes on these dates, it nevertheless is not reasonable to allow the City to be billed for hours that were spent duplicating the work of another. Therefore, the hours billed by Manning on the two days in contention will be reduced by one-half.

### 2. Reasonable Hourly Rate

■ After the reasonable time expended has been determined, the Court is to multiply the number of hours by a reasonable hourly rate. *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. To determine a reasonable hourly rate, this Court must find the prevailing hourly rate for attorneys with similar skill, experience and reputation in the Boston area, irrespective of the private or nonprofit nature of counsel. McDonough, the party requesting fees, has the burden (1) to establish the experience and skill of his lawyers and (2) to inform the Court of the prevailing market rate in the community for attorneys with such qualifications. *Blum v. Stenson*, 465 U.S. 886, 895–96 & n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (asserting that reasonable fees in a federal civil rights action under 42 U.S.C. § 1988 are to be calculated according to the prevailing market rate in the relevant community, regardless of whether counsel is private or nonprofit); *Martino v. Mass. Bay Transp. Auth.*, 230 F.Supp.2d 195, 205 (D.Mass.2002) (applying the approach discussed in *Blum* to a request for attorney's fees by a prevailing party under Title VII).

Campagna requests an hourly rate of $300.00 as lead counsel. Pl.'s Mem. at 5[sic]. In support of the requested rate, Campagna asserts her own affidavit detailing her experience as a lawyer and also

submits an affidavit of Lynn Weissberg, a practicing attorney in Massachusetts. Campagna Aff. at ¶¶ 2–8; Aff. of Lynn Weissberg [Docket No. 97] ("Weissberg Aff.") ¶ 6. To further demonstrate the reasonableness of the hourly rate requested, Campagna has submitted clips from the "Annual Survey of the 100 Largest Law Firms in Massachusetts" published in the April 26, 2004 issue of *Lawyers Weekly Publications* which include the hourly billing rates for several listed firms. Pl.'s Mem., Ex. A ("Survey").[6]

Manning requests an hourly rate of $225.00 as assisting counsel. Pl.'s Mem. at 5[sic]. Manning submits an affidavit briefing her experience as counsel in Massachusetts in support of the rate requested. Aff. of Atty Mary–Ellen Manning in Supp. of Pl.'s App. for Atty's Fees [Docket No. 110] ("Manning Aff."). Legal assistant Ward requests an hourly rate of $100.00 and submits an affidavit in support which discusses his educational background and his general responsibilities as a paralegal. Aff. of Brendan L. Ward in Supp. of Pl.'s App. for Atty's Fees [Docket No. 96] ("Ward Aff.").

In response, the City argues that the rates requested are outrageous and are not in accord with recent rates awarded by the Federal District Court of Massachusetts. In support, the City cites several cases dating from 1999 to 2004 and notes that in all cases listed, the hourly rate awarded is far below those requested by Campagna, Manning, and Ward. Def.'s Opp'n at 3–5. In addition, the City argues that the fee rate should be further reduced because an employee with a lesser compensation rate could have performed some of the tasks listed as billable by Campagna and Manning. *Id.* at 5–6 (citing *Mogilevsky v. Bally Total Fitness Corp.,* 311 F.Supp.2d 212, 217–18 (D.Mass.2004)) (for the proposition that the hourly rate of an attorney should be reduced to account for hours expended on tasks that could have been performed by employees with lower hourly rates). Finally, the City contends that the hourly rates requested should be reduced to account for time spent on "non-core" work, such as writing letters, making phone calls, and travel. *Id.* at 6.

The Court recognizes that the larger firms in Boston bill at rates equal to or higher than those requested here, as is evidenced by the Survey submitted to the Court. Furthermore, there are some economics of scale, and big firm attorneys generally are able to bill at a higher rate than those in smaller firms precisely because much of the work at larger firms is performed by employees with significantly lower hourly rates. *See Mogilevsky,* 311 F.Supp.2d at 217–18 (noting that while it is not proper to distinguish between "core" and "non-core" work in determining a reasonable hourly rate, nevertheless the Court should not allow an attorney to recover a standard rate for tasks that an employee with a significantly lower hourly rate could have performed) (citations omitted); *see also Martino,* 230 F.Supp.2d at 205 (reducing the hourly rate requested from $260.00 to $200.00 after noting that the requesting attorney was a solo practitioner who performed tasks that undoubtedly would have been performed by employees with a lower hourly rate had the attorney been practicing at a larger firm).

---

**6.** *See also* the testimony of James Sagel, Esq., an attorney for 24 years who is a partner in Wilmer, Cutler, Pickering, Hale & Dorr specializing in corporate financing, that his current billing rate is $595/hour. *Tiverton Power Associates Limited Partnership v. The Shaw Group, Inc.,* Civil Action No. 01–10914–WGY (D.Mass. Jan. 11, 2005) (daily transcript of testimony at 78).

Even once permissible economies of scale are factored into the analysis, however, there remains a puzzling and disturbing gap between big firm billing rates and the rates used by my colleagues and myself in determining court awarded attorney's fees. How can this be? Surely, this Court does not undervalue those diligent and devoted attorneys who specialize in advocating for the civil rights of the individual. Indeed, these lawyers generally are among the most outstanding practitioners in our civil trial bar.

Upon reflection, though, the gap between billing rates and court awarded rates is more apparent than real. Billing rates are just that—an initial demand for payment. They may well not reflect the actual "yield" from the bills sent out. It has been my experience as an intern, associate, and partner in big New York and Boston law firms (albeit years ago) that well run firms keep very close tabs on this "yield," i.e., the spread between the hours billed and the comparable amounts clients are actually willing to pay. Naturally, firms keep their "yield" data closely guarded and confidential. Lawyers, especially big firm lawyers, well understand the economic advantage of published billing rates to create the impression that revenues are routinely commensurate with hours billed at published rates. Equally, sophisticated clients—especially corporate clients—well understand that "it depends." For present purposes, it is enough to note that published billing rates are of little aid to a court in establishing the actual market for the legal services provided here.

Furthermore, while the Court respectfully notes the affidavit of Lynn Weissberg, this affidavit adds little to demonstrate the reasonableness of Campagna's request. Weissberg simply states that she believes the rate is reasonable considering her knowledge of the prevailing market rates. Weissberg Aff. at ¶ 6. There is no specific information asserted regarding how she has come to know either the prevailing market rate or how the experience of Campagna compares to the norm.

Here, having considered the experience of Campagna, Manning, and Ward, the complexity of the issues in the case at hand, and the Court's knowledge of the prevailing market rates for attorneys and legal assistants with comparable backgrounds, the Court finds that $200.00/hour, $150.00/hour, and $50.00/hour are reasonable rates respectively.

### a. Attorney Marisa A. Campagna

Campagna has submitted an affidavit which reveals an impressive and lengthy background in employment law. Campagna Aff. Campagna has been licensed to practice law in Massachusetts for over fifteen years and has concentrated in employment law for eleven years. *Id.* She has been sole representative counsel in fifteen jury trials and several other jury waived trials, though there is no indication as to the success of these cases. *Id.* Campagna further notes that she co-authored briefs in several successful cases in Massachusetts courts and for several years has participated substantially in the Massachusetts Chapter of the National Employment Lawyers Association. *Id.*

Taking into account Campagna's eleven years of experience in employment law, the length and complexity of the case at hand, and the rates awarded to civil rights attorneys in the Boston area recently, the Court finds that $200.00 is a reasonable hourly rate. While prior cases do not necessarily provide precedent regarding the reasonableness of the fees awarded, they nevertheless provide a reflective picture of what is happening in the market. *System Mgmt., Inc.*, 154 F.Supp.2d at 210. Thus, a look at what Massachusetts courts

have awarded as attorney's fees in recent cases is a helpful aid in weighing the appropriateness of a calculated rate. The case law confirms that $200.00 is a reasonable hourly rate for an attorney in Boston with experience comparable to that of Campagna. *See, e.g., Martino,* 230 F.Supp.2d at 205–06 (awarding $200.00 as hourly rate for civil rights attorney); *System Mgmt., Inc.,* 154 F.Supp.2d at 210 (approving an hourly rate of $235.00 for an attorney with twenty-four (24) years of experience and an hourly rate of $200.00 for an attorney with eleven (11) years experience); *Ciulla v. Rigny,* 89 F.Supp.2d 97, 104 (D.Mass.2000) (awarding civil rights attorney hourly rate of $200.00); *Connolly v. Harrelson,* 33 F.Supp.2d 92, 95–96 (D.Mass.1999) (approving hourly rate of $200.00 for civil rights attorney with twenty-five years of experience); *McLaughlin by McLaughlin v. Boston Sch. Comm.,* 976 F.Supp. 53, 62 (D.Mass. 1997) (Garrity, J.) (awarding civil rights attorney $200.00 hourly rate).

### b. Attorney Mary–Ellen Manning

Mary–Ellen Manning submitted an affidavit describing her background in order to support her requested hourly rate of $225.00. Manning Aff. Manning's affidavit notes that Manning has been licensed to practice law since 1991 and is admitted to practice before the United States Supreme Court. *Id.* Although Manning practices general litigation, she has done considerable work on employment discrimination claims for several years. *Id.* At the time of filing of this affidavit (April 2004), Manning indicated that she was currently representing federal court plaintiffs in a race discrimination case and in a civil rights case, both against municipalities. *Id.* In addition, Manning has been lead counsel in one jury trial and in several jury waived trials, though there is no indication as to the outcomes of these trials. *Id.*

Manning's experience in employment law, while commendable, is substantially less than that of Campagna. While Campagna has spent eleven years concentrating in the field, Manning has only spent the last nine years active in the field, and still does not indicate that she has spent the majority of her time on relevant cases. *Id.* Furthermore, Campagna has been licensed to practice in Massachusetts longer and has been the lead counsel in fourteen more jury trial cases than has Manning, fourteen more to be exact. *Id.* In light of this comparison, it seems reasonable to compute Manning's rate at about one-fourth less than the rate awarded Campagna. The Court therefore finds that a reasonable hourly rate for Manning is $150.00. *See, e.g., Clifton v. Mass. Bay Transp. Auth.,* 11 Mass.L.Rptr. 316, 2000 WL 218397, at *17 (Mass.Super.2000) (Gants, J.) (awarding an hourly rate of $175.00 to an attorney who handled much of the discovery and research and awarding an hourly rate of $125.00 to an attorney who organized trial materials and performed some legal research). This reduction of the rate requested to $150.00 will also account for the less vigorous work performed by Manning, such as developing a chalk line, traveling to and from the copy shop, and researching case law. Manning Aff., Ex. A. This figure is reasonable and appropriate in considering the prevailing market rates for assistant counsel with comparable experience in the Boston area.

### c. Legal Assistant Brendan Ward

Brendan Ward is a full-time legal assistant for Manning, earning a salary of $39,850.00 per year. Ward Aff. He earned a Bachelor of Science degree in business administration from the University of New Hampshire in 1999. *Id.* In this case, Ward's work consisted primarily of taking notes at trial and conferring with Manning

and Campagna following the trial each day. Manning Aff., Ex. A. Fifty dollars per hour is a reasonable hourly rate after considering the work done by Ward, Ward's experiential background, and the prevailing market rates for paralegals in Boston. *See, e.g., Rolland v. Cellucci,* 151 F.Supp.2d 145, 149 (D.Mass.2001) (Neiman, M.J.) (awarding hourly rate of $30.00 to paralegal with less than one year of experience); *Guckenberger v. Boston University,* 8 F.Supp.2d 91, 107 (D.Mass.1998) (Saris, J.) (awarding law clerks an hourly rate of $60.00 for core work and $40.00 for non-core work).

### c. *Other Factors*

The attorney's fees to be awarded will be calculated according to the reasonable hours expended and the reasonable hourly rates as found herein. The Court uses its discretion in determining that no other factors call for an upward or downward adjustment of the lodestar calculation. The City argues, *inter alia,* that the fees should be reduced because McDonough did not prevail on all claims originally presented to the Court. Def.'s Opp'n at 11. After presentation of the evidence on April 20, 2004, the Court granted in part and denied in part the City's motion for judgment as matter of law, which had been filed by the City on April 16, 2004. Def.'s Mot. for J. [Docket No. 89]. In light of this fact, the City argues that the fee award should be substantially reduced.

 The results obtained are a significant factor to be considered in determining reasonable fees to be awarded. *Hensley,* 461 U.S. at 434–37, 103 S.Ct. 1933. This Court has held that where "unsuccessful claims are unrelated and easily severable from the successful claims, then hours spent on them will be eliminated. By contrast, if they are substantially interconnected—because they share a common core of facts or are based on related legal theories—hours spent on them will typically be recoverable." *Martino,* 230 F.Supp.2d at 201 (citations omitted). In the instant case, five separate but related incidents of discriminatory conduct were presented, and only two incidents were allowed to go to the jury for deliberation. All these incidents, however, were based on a common core of facts and no separate legal theories were raised in arguing the incidents that did not make it to the jury for consideration. "Where a plaintiff has obtained excellent results ... the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933 (citation omitted).

### B. Costs

McDonough seeks costs in the amount of $8,990.41. Pl.'s Mem. at 6[sic]. The details of the costs sought are scattered throughout Exhibit A of the Campagna Affidavit which details hours reasonably expended, and proof of such costs are attached at Exhibit B. Campagna Aff., Exs. A, B. The costs listed generally included filing fees, service fee costs, deposition costs, expert witness fees, and costs of copying and preparing trial exhibits. *Id.* The City asserts that the costs are excessive with no explanation as to why. Def.'s Opp'n at 2.

 The costs sought by McDonough are sufficiently detailed and reflect reasonable expenditures in preparation for a civil rights case being tried before a jury. Although some of these costs include what are known as "out-of-pocket expenses," many courts have held that such expenses are recoverable for Title VII prevailing plaintiffs, and this Court is persuaded by these cases. *See Wilcox,* 921 F.Supp. at 850; *see also Palmigiano v. Garrahy,* 707

F.2d 636, 637 (1st Cir.1983) (construing out-of-pocket expenses as recoverable under section 1988). Accordingly, this Court grants costs in the full amount sought.

## C. Interest

McDonough requests prejudgment interest on the award of compensatory damages and on any portion awarded as costs and attorney's fees from October 30, 2001, the date the Complaint was filed. Pl.'s Mem. at 7[sic]. McDonough also requests post judgment interest on all amounts awarded at the Massachusetts rate from April 21, 2004. Id. The City argues that McDonough is not entitled to prejudgment interest or post judgment interest at the Massachusetts rate. Def.'s Opp'n at 13–15.

### 1. Prejudgment Interest

McDonough seeks prejudgment interest at the Massachusetts rate, twelve percent per annum beginning on the date the complaint is filed pursuant to chapter 231, section 6B of the Massachusetts General Laws,[7] or under federal law. Pl.'s Mem. at 7[sic]; Pl.'s Reply at 4. The City argues that it is a sovereign immune from prejudgment interest under Massachusetts law and that the Court should use its discretion to award no interest under federal law. Def.'s Opp'n at 14.

"[T]he rules of construction governing statutory waivers of sovereign immunity are stringent." Onofrio v. Dep't of Mental Health, 411 Mass. 657, 659, 584 N.E.2d 619 (1992) (citations omitted) (discussing generally the doctrine of sovereign immunity and holding that post judgment interest is not recoverable against a public employer absent express statutory authority). No interest is to be awarded for successful claims under chapter 151B of Massachusetts General Laws against cities of the Commonwealth. See City of Salem v. Mass. Comm'n Against Discrimination, 44 Mass.App.Ct. 627, 646–47, 693 N.E.2d 1026 (1998) (ordering that interest be stricken from the order awarding attorney's fees against the City of Salem based on the doctrine of sovereign immunity); City of Boston v. Mass. Comm'n Against Discrimination, 39 Mass.App.Ct. 234, 245, 654 N.E.2d 944 (1995) ("interest does not ... lie against the Commonwealth or its instrumentalities ... in the absence of express statutory authorization ... There is no express statutory authorization for the payment of interest on awards under G.L. ch. 151B against the Commonwealth or its instrumentalities."). Section 6B of chapter 231, which McDonough asserts is applicable, does not expressly provide for the grant of prejudgment interest against the Commonwealth or its instrumentalities. In other words, section 6B provides no express statutory authority which would indicate a waiver of sovereign immunity. Cf. Mass. Gen. Laws ch. 231, § 6C (expressly providing that interest may be awarded against the Commonwealth); see also City of Boston v. Mass. Comm'n Against Discrimination, 39 Mass.App.Ct. at 246, 654 N.E.2d 944 (urging comparison of section 6B and section 6C).[8] McDonough, therefore, is not entitled to seek

---

7. Chapter 231, section 6B of Massachusetts General Laws reads as follows:

In any action in which a verdict is rendered or a finding made or an order for judgment made for pecuniary damages for personal injuries to the plaintiff or for consequential damages, or for damage to property, there shall be added by the clerk of court to the amount of damages interest thereon at the rate of twelve per cent per annum from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law.

Mass. Gen. Laws ch. 231, § 6B.

8. The First Circuit has previously added prejudgment interest to an award of attorney's fees sought pursuant to section 6B against an

prejudgment interest against the City of Quincy pursuant to chapter 231, section 6B of Massachusetts General Laws. The fact that prejudgment interest cannot be asserted against the City of Quincy pursuant to Massachusetts state law, however, does not necessarily bar recovery of prejudgment interest, because Title VII provides no such immunity to the City.[9]

■ In the present case, McDonough has the luxury of choosing the body of law under which damages (and interest) will be awarded. "[I]n cases where parallel claims are brought under both federal and state laws, and the damages recovered are duplicative, i.e., not segregated into separate federal and state components, a prevailing plaintiff is entitled to select the body of law under which the damages will be paid." *Foley*, 948 F.2d at 17 (citations omitted) (allowing the prevailing plaintiff to choose between state and federal interest rates in a suit based on both section 1983 and pendent state law claims).[10] The decision to award prejudgment interest to a prevailing plaintiff under Title VII to make the plaintiff whole lies within the discretion of this Court, as the City concedes. *Conway v. Electro Switch Corp.*, 825 F.2d 593, 602 (1st Cir.1987); Def.'s Opp'n at 14–15. This Court thus determines in its discretion that prejudgment interest is reasonable and appropriate in order to make McDonough whole and will be awarded such at the federal rate, which averaged about 1.41% the week preceding the date of judgment.[11] *See Eldred v. Consol. Freightways Corp. of Del.*, 907 F.Supp. 26, 28 (D.Mass.1995) (Ponsor, J.);

---

instrumentality of the Commonwealth. In *Foley v. City of Lowell*, 948 F.2d 10, 17 (1st Cir.1991), the First Circuit, without any discussion of sovereign immunity, awarded prejudgment interest to the prevailing plaintiff in a civil rights action. There, the City of Lowell apparently conceded that the plaintiff was entitled to prejudgment interest, and the issue of sovereign immunity was not squarely before the Court. For this reason, this Court does not construe *Foley* as binding precedent and follows Massachusetts precedent in holding that the doctrine of sovereign immunity precludes recovery of prejudgment interest against an instrumentality of the Commonwealth absent express statutory authority providing otherwise.

9. Section 114 of the Civil Rights Act of 1991 was enacted specifically to allow interest on judgments against the United States in direct response to a ruling by the Supreme Court to the contrary in *Library of Congress v. Shaw*, 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986). *See Woolf v. Bowles*, 57 F.3d 407, 409–10 (4th Cir.1995) ("Title VII now contains the express waiver of interest immunity lacking at the time *Shaw* was decided.") In any event, the Supreme Court appeared to limit the holding in *Shaw* to the "no-interest rule" applicable to the United States, declining extension of the rule to state immunity. *See Jenkins*, 491 U.S. at 281 n. 3, 109 S.Ct.

2463, (stating that the "added gloss of strictness" of the "no-interest rule" is only applicable where the liability of the United States is at issue) (citation omitted). The First Circuit further limited the holding of *Shaw* in *Reopell v. Commonwealth of Massachusetts*, 936 F.2d 12, 15 (1st Cir.1991) (discussing *Jenkins* and stating that "[w]e believe, therefore, that there is no longer any strict requirement that prejudgment interest be *expressly* sanctioned by Congress in order to be recoverable in an action against a state brought pursuant to a federal statute—provided, of course, the Eleventh Amendment has been effectively abrogated by Congress in respect to the underlying damages award.").

10. While the City argues that McDonough has not moved for an award of prejudgment interest under federal law, McDonough makes clear in his Reply that he should be awarded interest "[w]hether it is awarded under state or federal law ....". Pl.'s Reply at 4. In any event, it is not clear that McDonough failed originally to assert a claim for interest under federal law in the event that state law was found not to apply. *See* Pl.'s Mem. at 7[sic] (stating simply that federal law is silent on the issue of prejudgment interest).

11. The federal judgment interest rate is encoded at section 1961 of Title 28 of the United States Code. The rate for the week preceding

see also Denton v. Boilermakers Local 29, 673 F.Supp. 37, 51 (D.Mass.1987) (Wolf, J.).

Accordingly, this Court awards prejudgment interest at the federal rate (1.41%) to be assessed on the full amount awarded by the jury from the date of the filing of the Complaint, October 30, 2001, to the date the judgment was entered, April 21, 2004. This interest shall not be added to the attorney's fees and costs granted herein.

### 2. Post Judgment Interest

 McDonough requests that he be awarded post judgment interest on all amounts awarded at the Massachusetts rate from April 21, 2004, the date of judgment. Pl.'s Mem. at 7[sic]. The City counters that McDonough is not entitled to the Massachusetts rate, but only to the federal rate. Def.'s Opp'n at 15. McDonough asserts no specific state provision in his quest to recover post judgment interest. Pl.'s Mem. at 7[sic]. In the absence of such a provision allowing for post judgment interest against the City, this Court is obliged to agree with the City in concluding that the federal rate must be applied to all post judgment interest awarded herein. Post judgment interest runs from the date of entry of the merits judgment, as calculated in accordance with section

1961 of Title 28 of the United States Code.[12] See Mogilevsky, 311 F.Supp.2d at 224–26. Post judgment interest is to be calculated to affect the entire judgment, including attorney's fees and costs awarded herein. See Mill Pond Assocs., Inc. v. E & B Giftware, Inc., 751 F.Supp. 299, 302–03 (D.Mass.1990) (asserting that the entire judgment, including attorney's fees and costs, must be considered principal in assessing post judgment interest).

Accordingly, post judgment interest will run on the entire award at the rate of 1.41%, including fees and costs, from the date of judgment, April 21, 2004, forward.

## II. CONCLUSION

In conclusion, this Court awards a total of $90,125.00 in attorney's' fees and $8,990.41 in costs, for a total of $99,115.41. See Appendix A. Prejudgment interest shall be assessed to the full amount of the jury award at the federal rate of 1.41% from October 30, 2001 to April 21, 2004. Post judgment interest at the same rate shall be assessed to the award plus fees and costs from April 21, 2004 forward.

SO ORDERED.

April 21, 2004 was 1.41%. Board of Governors of the Federal Reserve System, Federal Reserve Statistical Release H.15 Selected Interest Rates (Apr. 19, 2004), available at http://www.federalreservegov/releases/h15/20040419/

12. Section 1961(a) of Title 28 of the United States Code provides, in part, that "interest shall be allowed on any money judgment in a civil case recovered in a district court." There are, however, often two distinct judgments in civil rights cases: the "merits judgment," which grants the prevailing party the right to recover attorney's fees and the "exact quantum judgment," which defines the precise amount of the fee award. See Nick J.

Kemphaus & Richard A. Bales, Interest Accrual on Attorney's Fee Awards, 23 Rev. Litig. 115, 116 (2004). The circuits are split as to when interest on an attorney's fee award begins to accrue, with the Fifth, Sixth, Eighth, Ninth, Eleventh, and Federal Circuits holding that interest begins to accrue under section 1961(a) from the date of the merits judgment, and the Third, Seventh, and Tenth Circuits holding that interest begins to accrue on the date of the exact quantum judgment. Id. at 116–17. Consistent with this Court's decision in Mogilevsky v. Bally Total Fitness Corporation, interest on awarded attorney's fees and costs shall accrue as of the date of the underlying merits judgment. See 311 F.Supp.2d at 226.